**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | Case No. 25-CV-265-RAW-DES |
| | ) | |
| STATE OF OKLAHOMA | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |

<u>**BRIEF OF AMICUS CURIAE PUBLIC JUSTICE**</u>

## INTRODUCTION

In this case, the federal and state executive branches have "partner[ed]" to "end" a law that extends "in-state tuition" to thousands of Oklahoma students by judicial decree. Off. of the Okla. Att'y Gen., "Trump DOJ and Drummond partner to end in-state tuition for illegal immigrants," Oklahoma.gov (Aug. 5, 2025), https://perma.cc/Z3BL-PPW7 ("AG Press Release"); Joint Mot. for Entry of Consent Judgment 2, ECF No. 9. Putting aside that the 22-year-old statute they seek to erase—like the nearly two-dozen similar statutes enacted by states across the country—is fully consistent with federal law, this Court lacks jurisdiction to grant the parties' joint request. The Constitution limits the federal "judicial power" to adjudicating "actual controversies arising between adverse litigants." *Muskrat v. United States*, 219 U.S. 346, 361 (1911). The founders did not authorize courts to set aside laws in "friendly suit[s]" between partners. *Ashwander v. Tennessee Valley Auth*., 297 U.S. 288, 346 (1936) (Brandeis, J. concurring).

The Court should deny the motion for a consent decree and dismiss this case for lack of jurisdiction. If the Court retains jurisdiction, it should give affected parties thirty days, rather than three, to object to the magistrate's report and recommendation.

## BACKGROUND

In 2003, the Oklahoma legislature authorized the State Regents for Higher Education ("OSRHE") to allow students to pay in-state tuition at state colleges and universities if they (1) "[g]raduated from a public or private high school" in Oklahoma and (2) "[r]esided in [Oklahoma] with a parent or legal guardian while attending classes at a public or private high school" in Oklahoma for at least two years prior to graduation. Senate Bill 596, 2003 Okla. Laws, c. 210, § 1 (codified at Okla. Stat. Ann. tit. 70, § 3242(A)) (the "Act").

Undocumented immigrants may be eligible for in-state tuition under this provision only if they meet the state's admissions standards for the institution in which they enroll and meet certain additional requirements. Okla. Stat. Ann. tit. 70, § 3242(B). If a student "cannot present to the institution valid documentation of United States nationality or an immigration status permitting study at a postsecondary institution," he must (a) "provide to the institution a copy of a true and correct application or petition filed with the United States Citizenship and Immigration Services to legalize the student's immigration status" or (b) file an affidavit stating that the student will file such an application "at the earliest opportunity" but "in no case later than" certain specified deadlines, then furnish copy of their application within those same deadlines. *Id.*

The OSRHE, which controls the Oklahoma higher education system, has adopted a policy to implement the statute. *See* OSRHE Policy and Procedures Manual ("OSRHE Policy") § 3.18. The policy "closely mirrors its enabling Oklahoma statute" in key respects. Compl. ¶ 28, ECF No. 2. It provides that "[u]nless residency has been established in another state, an individual who resided in Oklahoma at the time of graduation from an Oklahoma high school and has resided in the state with a parent or legal guardian for two years prior to graduation from high school will be eligible for in-state status and as allowed by th[e] policy." OSRHE Policy § 3.18.2.E. Undocumented students "are eligible for enrollment and/or out-of-state tuition waivers" if they meet a list of requirements that match those set out in the Act. *Id.* § 3.18.6. The policy also allows institutions to waive tuition for U.S. citizens who live outside Oklahoma on various grounds, regardless of their residency. *See id.* § 3.18.2(H); *id.* § 4.15.4(A)(3)(b), (4), (5), (7), (10).

Thousands of students across Oklahoma benefit from the Act and the Policy. *See* OSRHE, State System Fall Enrollment Increased for Fourth Consecutive Year, https://perma.cc/F759-T86L (noting that around 169,004 students enrolled in Oklahoma state institutions of higher education

in 2024); Oklahoma, Higher Ed Immigration Portal, Presidents' Alliance on Higher Education and Immigration, https://perma.cc/M2E5-6HDE (estimating that around 1.3 percent of Oklahoma college students are undocumented immigrants).

Seven days ago, the federal government sued Oklahoma to "declare" the Act "illegal and permanently enjoin its enforcement." Compl. 2. The government claims that the Act and the OSRHE Policy conflict with two federal statutes: the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") and the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"). *See* 8 U.S.C. § 1621(d) (PRWORA) ("A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible . . . only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility."); 8 U.S.C. § 1623(a) (IIRIRA) ("Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.").

Within hours of the filing, the United States and Oklahoma filed a joint motion for a consent decree. *See* ECF No. 9. The motion is three pages long. *See id.* It contains no legal analysis and no description of any negotiations that led to the agreement. *See id.* Instead, it simply states that Oklahoma agrees on all the United States' claims and consents to all the relief it seeks. They agree that the Act and OSRHE Policy § 3.18.6 "are preempted" by the IIRIRA and PRWORA, and they jointly request "that the Court enter a final judgment declaring that Okla. Stat., tit. 70, § 3242 and OSRHE Policy § 3.18.6 violate the Supremacy Clause and are therefore invalid" and

"enter a permanent injunction prohibiting [Oklahoma], as well as its successors, agents and employees, from enforcing" the Act and the OSRHE Policy. *Id.* at 2.

In a press release the same day, the Oklahoma Attorney General announced that he had "partner[ed]" with "President Trump's Department of Justice "to put an end" to the Act and the OSRHE Policy. AG Press Release. In the Press Release, the state attorney general offered a full-throated endorsement of the government's suit, along the President's immigration agenda. The release quoted him as follows:

> "Today marks the end of a longstanding exploitation of Oklahoma taxpayers, who for many years have subsidized colleges and universities as they provide unlawful benefits to illegal immigrants in the form of in-state tuition," Drummond said. "Rewarding foreign nationals who are in our country illegally with lower tuition costs that are not made available to out-of-state American citizens is not only wrong—it is discriminatory and unlawful."
>
> …
>
> "I am proud to stand with President Trump and support his efforts to secure our border, deport criminal illegal immigrants and ensure that benefits intended for American citizens are protected," Drummond said.

*Id.*

Two days after the parties filed their joint motion, the magistrate judge recommended that the motion be granted and the consent decree be entered. *See* Report and Recommendation 1, ECF No. 11. He ordered that any objections be filed within three days, *id.* at 3-4, meaning that any such objections were due today, Fed. R. Civ. P. 6(a)(1) (excluding weekends).

## ARGUMENT

### I.    This lawsuit is not a justiciable case or controversy.

A court may only enter a consent decree only if it "spring[s] from, and serve[s] to resolve, a dispute within the court's subject-matter jurisdiction." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192 (10th Cir. 2018) (quoting *Frew v. Hawkins*, 540 U.S. 431, 437 (2004)). When

concerns arise about the court's subject matter jurisdiction, courts "are obligated to consider" them "*sua* sponte," *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), because a lack of subject matter jurisdiction "deprives courts of power to hear the case, thus requiring immediate dismissal." *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 297 (2023).

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). That rule limits courts to deciding "genuine, live dispute[s] between adverse parties," *Carney v. Adams*, 592 U.S. 53, 58 (2020), "of the sort traditionally amenable to, and resolved by, the judicial process," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *accord Muskrat v. United States*, 219 U.S. 346, 361 (1911) ("Th[e] judicial power . . . is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction."). Article III thus "requires the federal courts to refrain from determining the validity of that legislation until the issue reaches [them] as part of" such a controversy. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1160 (10th Cir. 2005).

That bedrock limitation is rooted in the separation of powers. It "ensur[es] that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting *Allen v. Wright,* 468 U.S. 737, 750 (1984)). And it "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*, 445 U.S. 375, 382 (1980) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Because Article III demands live disputes between genuine adversaries, "there is no Art. III case or controversy when the parties desire 'precisely the same result.'" *GTE Sylvania, Inc.*, 445 U.S. at 382–83 (quoting *Moore v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 47,

48 (1971)); *Pool v. City of Houston*, 87 F.4th 733, 733–34 (5th Cir. 2023) ("It is well settled that, where the parties agree on a constitutional question, there is no adversity and hence no Article III case or controversy."). That rule serves democracy. If federal courts could "pass upon the constitutionality of legislation in a friendly, non-adversary" lawsuit, then "a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Ashwander* 297 U.S. at 346 (Brandeis, J. concurring). That is not the system the founders designed.

This is just the kind of "friendly suit" that undermines that design. Both parties "agree on [the] constitutional question," *Pool*, 87 F.4th at 733: they agree that the Act and the OSRHE Policy are preempted and unenforceable. Joint Mot. 2. And both "desire exactly the same result," *Moore*, 402 U.S. at 48: a declaration that the Act and policy are invalid and an injunction against their enforcement. Joint Mot. 2. Indeed, the day this case was filed, the Oklahoma Attorney General publicly announced that he had "partner[ed]" with the federal government to "end" the challenged laws. AG Press Release. There is no live dispute for the court to resolve.

The federal-state partnership raises two related problems. First, it shows that the United States lacks standing because Oklahoma has no intention of enforcing the challenged provisions and, therefore, threatens no "imminent" injury to the United States's interests. Second, it leaves this court with a one-sided demand bereft of the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204 (1962). We take each issue in turn.

**A.  The United States lacks standing**.

"A case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 676 (2023). "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

"[W]henever standing is unclear," the court "must consider it *sua sponte*" to ensure it has jurisdiction. *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1226 (10th Cir. 2021).

Even the United States must demonstrate standing to sue. 14 Wright & Miller's Federal Practice & Procedure § 3652 (4th ed.). As the Supreme Court determined "early and wisely," a federal court "cannot give advisory opinions even when asked by the Chief Executive." *Clinton v. Jones*, 520 U.S. 681, 701 n.33 (1997) (quoting *Chicago & Southern Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948)); *United States v. West Virginia*, 295 U.S. 463, 474 (1935) (holding that the United States lacked standing to sue for the court to resolve a "difference of opinion" about the "power and authority" of the United States vis-à-vis a state).

To invoke jurisdiction, then, the government "must show an injury in fact caused by the defendant and redressable by a court order." *Texas*, 599 U.S. at 676. The "injury must be legally and judicially cognizable," meaning it must be "traditionally redressable in federal court." *Id.* The government must also show that a "grant of relief would have some real-world, not theoretical, effect." *We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1257 (10th Cir. 2024).

The complaint alleges no such injury. It alleges that the Oklahoma law and policy "conflict with federal immigration law." Compl. ¶ 41. But a bare conflict of law is not a "judicially cognizable" injury that federal courts can redress. *Texas*, 599 U.S. at 676. As the Supreme Court has long held, a court cannot entertain "a proceeding against the government in its sovereign capacity" when "the only judgment required is to settle the doubtful character of the legislation in question." *Muskrat*, 219 U.S. at 361. A federal court has "no right to pronounce an abstract opinion

upon the constitutionality of a state law." *Massachusetts v. Mellon*, 262 U.S. 447, 484 (1923)

(quoting *Cherokee Nation v. State of Georgia*, 30 U.S. 1, 75 (1831)).[1]

To show standing, rather, a plaintiff must "assert an injury that is the result of a statute's

actual or threatened *enforcement*, whether today or in the future." *California v. Texas*, 593 U.S.

659, 672 (2021); *see also Mellon*, 262 U.S. at 488 ("The party who invokes the power [of Article

III courts] must be able to show, not only that the statute is invalid, but that he has sustained or is

immediately in danger of sustaining some direct injury as the result of its enforcement."response

"[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws

themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021); *accord Mellon*,

262 U.S. at 488 ("If a case for preventive relief be presented, the court enjoins, in effect, not the

execution of the statute, but the acts of the official, the statute notwithstanding"). So a plaintiff

lacks a redressable injury when it "fail[s] to allege or demonstrate" that the state is "likely to

enforce" the challenged law. *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007).

The record here strongly suggests that Oklahoma no longer intends to enforce the

challenged provisions—whether or not this court enters the consent decree. Before the magistrate

even had a chance to pass on the joint motion for a consent decree, the Oklahoma attorney general

announced that last Tuesday "mark[ed] the end" of in-state tuition for undocumented immigrants.

---

[1] Although the government has standing to bring criminal prosecutions to vindicate the "injury to its sovereignty arising from violation of its laws," *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000), a state does not "violate" federal law, as a criminal defendant does, whenever it passes a law that conflicts with a federal one. The Supremacy Clause merely "creates a rule of decision": Courts "must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). And a federal statute may not constitutionally prohibit a state from passing a law. While Congress can preempt state laws, it cannot "issue direct orders" to state governments or "dictate[ ] what a state legislature may and may not do." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471, 474 (2018).

AG Press Release. And the complaint does not allege the state will continue to enforce the law. The government thus fails to establish an imminent threat of enforcement. *See Winsness v. Yocom*, 433 F.3d 727, 736-37 (10th Cir. 2006) (holding there was no standing because the state had "foresworn any intention" to enforce the law); *see also Mink v. Suthers*, 482 F.3d 1244, 1254-55 (10th Cir. 2007) ("Where a plaintiff only seeks prospective relief, standing is defeated when there is evidence the government will not enforce the challenged statute against the plaintiff."); *Bronson*, 500 F.3d at 1109 (holding plaintiff lacked standing to challenge state law where state attorney general had announced policy not to enforce statute against relevant class of violations).[2]

Because the United States has not alleged that Oklahoma intends to enforce the challenged provisions—and Oklahoma's public statements indicate it does not intend to do so—an order declaring the law and policy preempted here would have no immediate "real-world effect." *We the Patriots, Inc.*, 119 F.4th at 1257. To be sure, it would give the United States what it seeks: a court opinion to brandish as precedent when it attacks similar laws in other states. But the fact that advisory opinions may influence other cases is exactly why courts should not enter them, "even when asked by the Chief Executive." *Clinton*, 520 U.S. at 701 n.33.

Of course, this does not mean that no court could ever review the Act. If Oklahoma denies an undocumented student in-state tuition on the ground that the state law is preempted, that student may seek judicial review of that decision. *See* Okla. Stat. Ann. Tit. 75, § 318 (2021). The reviewing

---

[2] That Oklahoma has announced its intent to "end" the challenged practice distinguishes this case from *United States v. Windsor*, in which the requested relief would have ordered the government "to pay money that it would not disburse but for the court's order." 570 U.S. 744, 758 (2013). In that case, there was an "adequate basis for jurisdiction in the fact that the Government intended to enforce the challenged law." *Id.* at 759. In that case, moreover, the "adversarial presentation of the issues [was] assured by the participation of *amici curiae* prepared to defend with vigor the constitutionality of the legislative act." *Id.* at 760. Not so here. While this brief summarizes the reasons why the Oklahoma law is valid below, it does not—and could not, in three business days— mount the full and detailed defense Oklahoma law deserves.

court could then decide whether the IIRIRA or PRWORA preempt the Act with the sort of adverse presentation "which sharpens the presentation of issues," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982), "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," *id.* at 472.

There is no such controversy here, however. Accordingly, the Court should decline the parties' joint motion for a consent decree and dismiss this case for lack of jurisdiction.

**B. The Court should not invalidate the Act without adversarial briefing.**

"Even when Article III permits the exercise of federal jurisdiction," the court may decline to hear a case because it lacks an adversarial "presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *United States v. Windsor*, 570 U.S. 744, 760 (2013) (quoting *Baker*, 369 U.S. at 204). No such dispute exists here: the parties pre-packaged this case in a one-sided bid for the same relief. Such a "collusive" suit "does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which [the Court has] have held to be indispensable to adjudication of constitutional questions." *United States v. Johnson*, 319 U.S. 302, 305 (1943).

Friendly suits pose special dangers when they ask the court to wipe out an act of the legislature with "far reaching effects on the public welfare" without any input from the affected people. *Johnson*, 319 U.S. at 305. Such one-sided demands are not just undemocratic, they invite uninformed decisions. This case is a prime example: In a three-page motion, the parties jointly urge the Court to nullify a 22-year-old act of the legislature on which thousands of students rely. Yet, in its rush to support the President's agenda, Oklahoma's executive branch has abandoned strong defenses for its own legislature's decision. In *Martinez v. Regents of Univ. of California*, the California Supreme Court held that a nearly identical law was not preempted by the IIRIRA

and PWORA. 50 Cal. 4th 1277, 1290 (2010) (upholding state law that extended in-state tuition to undocumented students who "possess a California high school degree or equivalent," "file an affidavit stating that they will try to legalize their immigration status," and attended "[h]igh school ... in California for three or more years"). Despite the decades that laws like this have been on the books, the government does not point to a single precedent that has held that any similar law conflicts with the PRWORA or IIRIRA. Tellingly, the only court to enjoin such a law's enforcement did in an unreasoned order approving a consent decree the government filed the same day it sued. *See United States v. Texas*, No. 7:25-cv-55, ECF No. 8 (N.D. Tex. filed June 4, 2025).

The Court should decline the parties' invitation to rubberstamp a decree with such little support and such far-reaching consequences without hearing any defense of the law.

If the Court decides to exercise jurisdiction, however, it should extend the deadline for affected parties to intervene to defend the law. As it stands, the warp-speed velocity of this case has left no time for amici to prepare a full defense on the merits the law deserves, let alone time for affected students or entities to retain counsel and draft motions and pleadings to intervene. Reserving judgment to allow time for an intervenor—or at minimum, an amicus—to brief the issues would not tax the court's resources, and adversary briefing would aid the court's decision.

## II.    The Court should reject the consent decree on the merits

Even if the Court exercises jurisdiction, it should reject the consent decree.

"Because the issuance of a consent decree places the power of the court" behind the parties' agreement, "the district court must ensure that the agreement is not illegal, a product of collusion, or against the public interest." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991). "The court also has the duty to decide whether the decree is fair, adequate, and reasonable before it is approved." *Id.* In evaluating fairness, the court "should consider whether the settlement was

negotiated at arms-length, and the court should 'look to the negotiation process and attempt to gauge its candor, openness and bargaining balance.'" *United States v. Doe Run Res. Corp.*, No. 15-CV-0663, 2017 WL 4270526, at *5 (N.D. Okla. Sept. 26, 2017) (quoting *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3d Cir. 2003)).

### A. The proposed decree is the product of collusion and lacks procedural fairness.

Ordinarily, a consent decree reflects a compromise that follows an arms-length negotiation and seeks to resolve a genuine dispute between adverse parties. Many are "the product of the parties' desire to settle long-running litigation through which the strength and weaknesses of each side's case [is] revealed." *United States v. Telluride Co.*, 849 F. Supp. 1400, 1403 (D. Colo. 1994).

Not so here. Oklahoma did not answer the complaint, propound one discovery request, or file a single brief. The parties' three-page joint motion contains no hint that the parties engaged in *any* negotiation over the consent decree—let alone arms-length negotiation. *See* ECF No. 9. Rather, the Oklahoma Attorney General's public statements confirm that the parties approached the decree as "partners," not adverse counterparties seeking to resolve a real dispute between them. Without any adversary process, the consent decree lacks any assurance that the agreement is fair to the students and institutions who rely on it. *See Telluride Co.*, 849 F. Supp. at 1403 (denying consent decree filed the same day as the lawsuit because "the negotiations leading to the decree" were not "themselves adversarial," and the case was "filed merely as a vehicle by which the parties' settlement agreement could receive judicial approval" and enforcement).

### B. The proposed decree does not address a violation of federal law.

When a consent decree seeks to enjoin state officials, it "must directly address and relate" to an ongoing violation of federal law. *Jackson*, 880 F.3d at 1192. Consent decrees "may be kept in place only as long as necessary to cure an unlawful condition." *Id.*

Accordingly, a consent decree cannot require state officials to disobey state law unless the challenged law conflicts with federal law. *See PG Publ. Co. v. Aichele*, 705 F.3d 91, 116 (3d Cir. 2013) (affirming the district court's refusal to approve a consent decree to enjoin a state statute because the challenged law did "not give rise to a violation of federal statutory or constitutional law and is therefore a valid state statute"); *St. Charles Tower, Inc. v. Kurtz,* 643 F.3d 264, 270 (8th Cir. 2011) (holding that a government entity may agree to a consent decree that is inconsistent with state law only if that "remedy is *necessary* to rectify a *violation of federal law*"); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) (vacating consent decree enjoining the enforcement of a state law because the decree "could not supersede California's law unless it conflicts with any federal law"); *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987) ("An alteration of the statutory scheme may not be based on consent alone; it depends on an exercise of federal power, which in turn depends on a violation of federal law.").

The consent decree does not address an ongoing violation of federal law. As explained, the record suggests that Oklahoma has no plan to enforce the challenged provisions. And a reasoned analysis would show that such enforcement would not violate federal law.

The provisions do not violate the IIRIRA. That federal statute provides that an undocumented immigrant "shall not be eligible on the basis of" in-state "residence" "for any postsecondary education benefit" unless a U.S. citizen or national "is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." 8 U.S.C.A. § 1623(a). Consistent with the statute, the Act permits U.S. citizens to be eligible for in-state tuition regardless of whether the citizen "is" a "resident" of Oklahoma. *Id.*; *see* Okla. Stat. Ann. tit. 70, § 3242(A). Like an immigrant, so long as a citizen attended an Oklahoma high school and lived in Oklahoma for two years before graduating, he is eligible for in-state

tuition—even if he no longer resides in Oklahoma. *See id.* As the government admits, the OSRHE policy "closely mirrors" the statute in key ways. Compl. ¶ 28. It makes certain U.S. citizens who are not Oklahoma residents eligible for in-state tuition if they graduated from an Oklahoma high school after living in-state for two years. OSRHE Policy § 3.18.2.E.[3] The policy also provides myriad other grounds for institutions to waive tuition for U.S. citizens who reside in other states, regardless of their residency. *See* OSRHE Policy § 3.18.2.(H); *id.* § 4.15.4(A)(3)(b), (4), (5), (7), (10). Undocumented immigrants are only one class of many who may receive such "out-of-state tuition waivers." *Id.* § 3.18.6(C). Because the Act and policy make U.S. citizens eligible for in-state tuition regardless of whether they reside in Oklahoma, both are consistent with the IIRIRA.

The Act and policy do not violate PRWORA, either. Under PRWORA, "[a] State may provide" that an undocumented immigrant "is eligible for any State or local public benefit for which such alien would otherwise be ineligible . . . only through the enactment of a State law" that "affirmatively provides for such eligibility." 8 U.S.C. § 1621(d). Oklahoma "affirmatively provides for [undocumented students'] eligibility" for in-state tuition, 8 U.S.C. § 1621(d), because it affirmatively authorizes such eligibility. Okla. Stat. Ann. tit. 70, § 3242.A.[4] The government

---

[3] OSHRE Policy § 3.18.2 tracks the Act's § 3242(A) except in one respect: it makes in-state tuition available to non-resident citizens who meet the statutory conditions "[u]nless residency has been established in another state." OSRHE Policy § 3.18.2.E. That section of the policy thus does not automatically extend in-state tuition to students who could qualify for in-state tuition in another state. But it still makes a U.S. citizen eligible for in-state tuition "without regard to" whether he resides in Oklahoma: so long as he has not lived long enough in another state to "establish residency" there, he still qualifies for in-state tuition if he meets the statutory conditions. *Id.*

[4] Moreover, PRWORA does not cover a state's decision to offer lower tuition rates. It only covers "monetary assistance paid to students or their households." *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 605 (E.D. Va. 2004). The government does not provide a "public benefit" whenever it charges someone less than it might have charged. The noun "'benefit' can be interpreted broadly as any 'advantage [or] good,' or more narrowly as a 'payment [or] gift [such as] financial help in time of sickness, old age, or unemployment.'" *In re McDaniel*, 973 F.3d 1083, 1098 (10th Cir. 2020) (citation omitted). PRWORA specifically defines "public benefit" with a list of examples

does not explain why a state cannot "affirmatively provide for" eligibility by "enabling" an agency to grant it. Compl. ¶ 42. And even if PRWORA applied as the government says it does—and required states to legislate in a certain way—it would violate the Tenth Amendment because it "dictates what a state legislature may and may not do." *Murphy*, 584 U.S. at 480-81 (holding that "Congress lacks the power to order a state legislature not to enact a law authorizing sports gambling" because it cannot issue a "direct command to the States").

Those are just a few of the reasons the government's claims fail. As explained above, if the Court is inclined to exercise jurisdiction, it should first give affected third parties time to intervene to present a full defense. The Court—and Oklahoma law—deserve more than the summary briefing this amicus could put together in three days. But the Court should not invalidate the law and policy based on the one-sided, skeletal motion the parties have filed.

## CONCLUSION

The court should deny the motion for a consent decree and dismiss the case for lack of jurisdiction. If it does not dismiss the case or deny the motion for a consent decree, it should extend the objection deadline to thirty days from today.

---

that typically involve payment of funds or other in-kind benefits, such as "retirement, welfare, health, disability, public or assisted housing," "food assistance" and "unemployment benefits," "for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." 8 U.S.C. § 1621(d). In statutory interpretation, "a word is known by the company it keeps," so courts "construe the list of words at issue as invoking their most general quality—the least common denominator, so to speak—relevant to the context." *In re McDaniel*, 973 F.3d at 1097. PRWORA's definition is thus best read to cover only postsecondary education benefits that share the same characteristics as the other benefits it lists: "'payment[s] or gift[s] such as financial help in time of sickness, old age, or unemployment.'" *Id.* at 1098 (brackets modified).

/s/ Nathan D. Richter
Nathan D. Richter, OBA No. 22003
BISON LAW FIRM
1609 Professional Circle
Yukon, Oklahoma 73099
Telephone:
Facsimile:
nathan@bisonlawfirm.com

*Local Counsel for Amicus Curiae*

Sean Ouellette*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
souellette@publicjustice.net

*Counsel for Amicus Curiae*

*\*Motion for admission pro hac vice forthcoming*